UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| HENRY JOSEPH GAINES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case Number: 5:11-cv-02373-JHH-JHE |
| | ) |
| GEORGE T. JOHNSON, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

Plaintiff Henry Joseph Gaines ("Gaines") brings this action against his former employer, Johnson Pools and Spas ("JPS"), and George T. Johnson ("Johnson") for race discrimination pursuant to Section 1981 of the Civil Rights Act of 1866 ("§ 1981"), 42 U.S.C. § 1981.[1] (Doc. 21). JSP has moved for summary judgment on Gaines's remaining claims. (Doc. 59).[2] Gaines has also moved for summary judgment on his claims. (Doc. 63).[3] For the reasons stated below, Defendants'

---

[1] Initially, Gaines also asserted claims under Title VII, the Fair Labor Standards Act, the Equal Pay Act, and the Age Discrimination in Employment Act; constitutional claims under the 5th, 6th, and 14th Amendments; a procedural due process claim; and a state-law age-discrimination claim. (Doc. 21). The Court dismissed these claims, leaving only Gaines's § 1981 claims. (Doc. 35).

[2] All citations to the record reference the document numbers provided by the court's electronic filing system. Citations to depositions also include a parenthetical reference to the page number(s) of the deposition.

[3] Defendants filed their motion for summary judgment on March 5, 2014, (doc. 59), the deadline for filing dispositive motions, as set by the Court's November 21, 2013 order granting the parties' joint motion for extension of time, (doc. 53). Gaines moved on March 4, 2013, to extend the deadline again, (doc. 57), which Defendants opposed, (doc. 58), and the Court denied on March 5, 2014, (doc. 62). As a result, Gaines's motion for summary judgment, received by the Court and deemed filed on March 10, 2013, (doc. 63), is not timely, and Defendants' motion to strike his motion, (doc. 64), is due to be **GRANTED** to the extent it seeks summary judgment.

However, Gaines did not file a separate response to Defendants' motion despite being put on notice of the requirement to respond to Defendants' summary judgment by Appendix 1 to the Scheduling Order. (*See* doc. 28 at 7-8) ("*All material facts set forth in the statement required of the*

motions for summary judgment are due to be **GRANTED**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324, 106 S. Ct. at 2553. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

---

*moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*" (emphasis in original)); (doc. 40 at 2) (in which Gaines acknowledges he "was ordered to comply with 'the summary judgment procedures outlined in Appendix 1.'"). Although his motion for summary judgment does not address Defendants' motion point for point, Gaines's motion does seek relief directly contrary to Defendants' motion and attempts to set out, with evidence and legal argument, the case Defendants' motion asserts he cannot. Because he has not filed a separate response in the nearly six months since Defendants' motion was filed, it appears he intended his motion for summary judgment to be his opposition to that motion. As Gaines's motion for summary judgment was filed within the time for filing his response to Defendant's motion, (*see* doc. 63), the Court will construe Gaines's motion for summary judgment as his response to Defendants' motion. *See Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."). Defendants responded to Gaines's motion, (doc. 65), but he did not file a reply.

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *see also Anderson*, 477 U.S. at 255, 106 S. Ct. at 2514 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252, 106 S. Ct. 2512).

## II. Factual Background

JPS is a pool design, installation, and retail business that has been operating in North Alabama since 1977. (Doc. 61-1 at ¶ 3). Johnson is president of G.T. Johnson Construction, Inc., which owns JPS, and he operates the construction side of JPS. (*Id.* at ¶¶ 2 & 5). Johnson and his wife, Penny Johnson, are the only people with the authority to hire or terminate employees. (*Id.* at 5). Johnson supervises all of JPS's construction employees. (*Id.* at 6).

Gaines worked with JPS in 1981 as part of a prisoner work-release program. (Doc. 61-4 at 21 (81-82)). He voluntarily left JPS and returned to Louisiana after his release in 1983. (*Id.* at 21 (83-84)). He returned to Alabama, and Johnson authorized his re-hire as a Laborer at JPS in 1988. (*Id.* at 24 (94)). As a Laborer, Gaines was responsible for the manual labor involved with

constructing swimming pools and the hardscape around them, including mixing cement, moving dirt, helping to lay decks, cleaning up job sites, or any other task the supervisor assigned. (*Id.* at 24 (95); doc. 61-1 at ¶ 6).

Gaines voluntarily left again in 1991, (doc. 61-4 at 26 (101)), and applied to be re-hired a third time on July 21, 1995, (*id.* at 26 (102)). Although Gaines's driver's license was suspended and company policy required all employees to have a valid license, Johnson re-hired Gaines as a Laborer. (*Id.* at 28 (112)).

On September 24, 1996, Gaines was arrested for possession of illegal drugs. (*Id.* at 29 (113-14, 116)). He never told JPS about the arrest and subsequent indictment. (*Id.* at 29 (114)). Gaines tested positive for drugs in December 1996, (*id.* at 29 (116)), which was grounds for termination, (*id.* at 30 (117)). JPS terminated Gaines's employment based on the positive drug test. (*Id.* at 30 (118)). Gaines was incarcerated for the drug arrest from May 1997 to April 2001. (*Id.* at 31 (121)).

In March 2002, Johnson re-hired Gaines a fourth time. (*Id.* at 31 (122-23), 32 (127)). Gaines was re-hired as a Laborer. (Doc. 61-1 at ¶ 26; doc. 61-2 at ¶ 3; doc 61-2 at 6; doc. 61-4 at 33 (129)). Construction Superintendent would have been a promotion from Gaines's previous Laborer position. (Doc. 61-1 at ¶ 6). Construction Superintendents are responsible for the management of a job from planning to completion and the supervision of Laborers, specifically, reviewing the pool construction plan, preparing the layout of measurements, interfacing with the customer, instructing the Laborers, ensuring safety procedures are in place and used, and communicating with JPS management about the job. (Doc. 61-1 at ¶ 6). Gaines's duties during his fourth term of employment were the same as the duties he performed during his previous periods of employment with JPS. (Doc. 61-4 at 33 (130)).[4]  When Gaines worked with Johnson, Dennis Wilcox, or James Castle, Gaines was

---

[4] Gaines's description of his duties appear to be consistent with a more experienced Laborer, who may have had the ability to direct other employees on what needed to be done, (doc. 61-4 at 33-

supervised by one of them. (Doc. 61-1 at ¶ 27; doc. 61-4 at 34 (136), 35-36 (140-41), 46 (182)). Gaines was hired as a Laborer, (doc. 61-1 at ¶ 26; doc. 61-2 at ¶ 3; doc. 61-4 at 33 (129)), and cannot state specifically when he would have been promoted, (doc. 61-4 at 33 (129)).[5]

In March 2002, Gaines signed, acknowledging that he had read, understood, and was willing to comply with the rules and regulations of G.T. Johnson Construction, Inc. and Johnson Pools and that failure to comply with the work code would result in termination. (Doc. 61-4 at 31 (123-24)). JPS's policy provided for drug testing of employees for cause, randomly, following an on-the-job accident, or as part of state recertification as a commercial driver. (Doc. 61-1 at ¶¶ 13-14). A "for cause" test may be required when the employee's appearance or behavior indicates the employee may be under the influence of drugs or alcohol. (*Id.* at ¶ 15). For the random tests, JPS provides its workers' compensation insurance carrier with a list of all of its employees. (*Id.* at ¶ 16). The carrier randomly selects employees to be tested and sends that list to the designated clinic, who informs JPS of the selected employees. (*Id.*). Employees are advised of the testing policy at the start of their employment. (*Id.* at ¶ 17). Gaines knew of the policy. (Doc. 61-4 at 32 (125)).

Gaines alleges he was paid less than white employees, (doc. 21 at 5-7), and sets out white employees Castle, Wilcox, and Oliver as comparators, (*id.*; doc. 61-4 at 44 (176)). He also alleges that he was not afforded the same opportunities for training as Wilcox and Castle, (doc. 21 at 12;

---

34 (129-35)); however, beyond that, he does not describe any duties as consistent with those of a Construction Superintendent as set out by Johnson above and unrefuted by Gaines.

[5] Gaines stated in his deposition: "I don't know initially -- maybe initially I was hired as, I guess, a laborer and *maybe* eventually it led up to a lead man. Somewhere along the line *I thought* I was hired as a lead man and had been working as a lead man from 2002 to 2009." (Doc. 61-4 at 33 (129)) (emphasis added). This statement indicates Gaines's testimony regarding his position is based on his belief he was a Lead Man and not a Laborer. "Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, "upon information and belief"—instead of only knowledge—from raising genuine issues of fact sufficient to defeat summary judgment." *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002). "Belief, no matter how sincere, is not equivalent to knowledge." *Id.* (quoting *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949)).

doc. 61-4 at 45 (177)), and that Wilcox and Castle were not disciplined as harshly for the same conduct, (doc. 21 at 8-9).

Oliver was a private contractor and not an employee of JPS between 2002 and 2009, (doc. 61-4 at 36 (144)), and, because Oliver was paid on a bid-per-job basis, Gaines does not know how much he was paid, (*id.* at 45 (180)). There is no evidence in the record of how much Oliver was paid.

Wilcox began employment with JPS in 1981, then worked as a building superintendent for Copeland Construction before returning to JPS in 2001. (Doc. 61-1 at ¶ 23). Upon his return, he had sixteen consecutive years of construction experience. (*Id.*). As of 2009, Wilcox was paid an hourly rate of $20.75. (Doc. 63 at 34). When Gaines worked with Wilcox, Wilcox was listed as the superintendent and would be the one responsible for telling everyone what to do on the job. (Doc. 61-4 at 46 (182-83)). Wilcox was involved in an accident in the company vehicle on April 13, 2007, and should have been required to submit to a drug test for the workers' compensation insurer to cover the accident. (Doc. 61-1 at ¶ 34; doc. 61-2 at ¶¶ 12-13). The insurer was responsible for having Wilcox tested, and, although a failed test would have been grounds for not covering the accident, the insurer covered the claim. (Doc. 61-1 at ¶ 34; doc. 61-2 at ¶¶ 13). Johnson and his wife did not know Wilcox was not tested. (Doc. 61-1 at ¶ 34; doc. 61-2 at ¶¶ 13).[6]

Castle was hired as a Laborer in June 2000 and, while employed at JPS, acquired skills, on his own time, in computerized swimming pool design programs that no one else at JPS had. (Doc.

---

[6] Gaines testified Wilcox was not tested after the accident and the Johnsons knew he was not tested, but his testimony regarding the Johnsons' knowledge is an assumption based on the company policy and office gossip about what happened and what the Johnsons should have known. (Doc. 61-4 at 60-61 (238-44)). He does not testify the Johnsons knew Wilcox would have had a positive drug test, nor does he state any direct facts from personal knowledge to support his claim they knew anything. The only reasonable inference from the admissible facts is the Johnsons had no knowledge that Wilcox was not tested for drugs after the accident or that he would have failed a test had he submitted to one.

61-1 at ¶¶ 24, 30). He was promoted to Construction Superintendent on March 1, 2002. (*Id.* at ¶ 24). He attended a class in Birmingham, Alabama, on electrical systems and technology developments for pools and spas, (doc. 61-1 at ¶ 31; doc. 55-3 at 6-7)[7], and studied the CBP certification manual on his own time, (doc. 61-1 at ¶ 29). As of 2009, Castle was paid an hourly rate of $18.25. (Doc. 63 at 35). In 2007, Castle's recertification drug test came back positive for marijuana but, because Johnson and his wife were away on business, the fax was put into Castle's file without anyone telling them about it. (Doc. 61-2 at ¶¶ 6-9). A subsequently received medical examination report did not indicate the failed drug test so Castle was recertified. (*Id.* at ¶ 9).[8] This was Castle's only positive drug test in ten years with JPS. (Doc. 61-2 at ¶ 11).

Gaines asserts both Castle and Wilcox attended plumbing and electrical training sometime between 2006 and 2009. (Doc. 61-4 at 50 (199), 51 (201-02)).[9]

Gaines was drug tested at least five times. (Doc. 63 at 19-33). On July 17, 2008, Gaines, Johnson, and John Losse were tested for drugs in accordance with the random drug testing policy.

---

[7] Although the dates are different between the affidavit (stating the "electrical control class" was in 2005) and the interrogatory response (stating the "training . . . on computerized pool systems" was in 2003), it appears these may be the same event.

[8] Gaines testified in his deposition Castle told him Castle was suspended after the drug test, used vacation time for the suspension, and was not required to retest upon return to work, (doc. 61-4 at 58, 60 (232, 237)). This testimony is inadmissible hearsay and cannot be considered on summary judgment, unless the statements could be reduced to admissible evidence at trial. *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). The *Macuba* court defined "reduced to admissible evidence" as meaning the statement falls within a hearsay exception or exclusion or is used solely for impeachment purposes. *Id.* at 1323-24. On that basis, it held hearsay evidence in an affidavit could not be considered on summary judgment because it recorded the hearsay statements two other named employees had made to the affiant and those statements did not fall into any exception to the hearsay rule. *Id.* at 1325. The same is true here, where Gaines's testimony regarding what Castle told him was given to assert the truth of the out-of-court, third-party statements, *see* Fed. R. Evid. 801(c), and does not fall within an exception, *see* Fed. R. Evid. 803. Moreover, even if the Court were to consider the evidence, it would avail Gaines nothing because Castle is not a proper comparator. *See* discussion in Section III.C., below.

[9] Johnson states no employees attended any plumbing or electrical training between 2006 and 2009. (Doc. 61-1 at ¶ 32).

(Doc. 61-1 at ¶ 35; doc. 61-2 at ¶ 15; doc. 61-4 at 55 (217-18)). Gaines's test came back positive for marijuana, his second positive test during his employment with JPS. (Doc. 61-1 at ¶ 36; doc. 61-2 at ¶ 15; doc. 61-4 at 55 (217); doc. 63 at 32). On July 29, 2008, Johnson met with Gaines to discuss the drug policy and advised him that his employment with JPS was terminated until he could present a negative drug test. (Doc. 61-1 at ¶ 37).[10] Gaines had used all of his vacation time for the year. (Doc. 61-2 at ¶ 14). At that time, Gaines was paid an hourly rate of $16.00. (Doc. 63 at 36). Gaines returned to work for JPS after a September 2008 drug test returned negative. (Doc. 61-1 at ¶ 38; doc. 61-4 at 58 (231)).

### III. Analysis

Section 1981 prohibits intentional discrimination on the basis of race in the making and enforcing of public and private contracts, including employment contracts. *Ferrill v. Parker Group, Inc.,* 168 F.3d 468, 472 (11th Cir. 1999) (citing *Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60 (1975).[11] "Disparate treatment" is prohibited, but "[a] showing of disparate impact through a neutral practice is insufficient to prove a § 1981 violation because proof of discriminatory intent is essential." *Id.* As result, "only direct or inferential modes of proving intentional discrimination are available to the § 1981 plaintiff." *Id.*

Where, as here, a plaintiff offers only circumstantial evidence, the court evaluates the sufficiency of his claims through the burden shifting framework established in *McDonnell Douglas*

---

[10] Gaines originally alleged he was suspended for 30 days without pay, (doc. 21 at 8); however, he testified in his deposition that, based on (what appears from Gaines's description to be) the document attached to Johnson's affidavit, (doc. 61-1 at 11), he was mistaken when he filed his complaint, and he was actually "terminated." (Doc. 61-4 at 58 (229-30)). He does not dispute he would be allowed to return upon presentation of a negative drug test.

[11] Because both § 1981 and Title VII have the same requirements of proof and use the same analytical framework, *see Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), the Court will use Title VII cases interchangeably with § 1981 cases.

*Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[12] Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case. (*Id.* at 802). "The successful assertion of a *prima facie* case then creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted). Once the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to produce evidence that it had a legitimate, non-discriminatory reason for the challenged action. *Rioux*, 520 F.3d at 1275. If the employer satisfies its burden, the burden shifts back to the plaintiff to "show that the proffered reason really is a pretext for unlawful discrimination." *Id.* (internal quotation marks and citations omitted).

### A. Wage Discrimination

To establish a *prima facie* case of wage discrimination, "a plaintiff must demonstrate that (1) [he] is a member of a protected class; (2) [he] received a lower salary than similarly situated comparators outside the protected class, and (3) [he] was qualified to receive the higher salary." *Welch v. Mercer Univ.*, 304 F. App'x 834, 836 (11th Cir. 2008) (citing *Cooper v. Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)). It is undisputed (1) Gaines is black and, therefore, a member of a protected class and (2) he received a lower salary than two of his alleged comparators.[13] Defendants contend Gaines's alleged comparators are not similarly situated and, therefore, Gaines cannot establish a *prima facie* case. (Doc. 60 at 17-20).

---

[12] "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). All of Gaines's evidence requires an inference to get from the alleged fact to the conclusion of racial animus; therefore, the evidence in not direct evidence and the Court must apply the *McDonnell Douglas Corp.* framework.

[13] It is undisputed Oliver was not an employee of JPS but an outside contractor who was paid on a bid-per-job basis, (doc. 61-4 at 36 (144), 45 (180)), and there is no evidence in the record regarding what Oliver was paid during the relevant period. He is not a proper comparator.

"The plaintiff and the employee [he] identifies as a comparator must be similarly situated in all relevant respects. The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (internal citations and quotation marks omitted). "That is, the plaintiff's comparators must perform the same type of tasks that the plaintiff performs at work. When determining whether an individual is a proper comparator to the plaintiff, courts look to the amount of years an individual has worked for the employer and the type of expertise that the individual has." *Davis v. Dunn Const. Co., Inc.*, 872 F. Supp. 2d 1291, 1310 (N.D. Ala. 2012) (citing *Cooper*, 390 F.3d at 735, and *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (finding the alleged comparator not similarly situated because she had been employed "for several years longer" and "possessed specialized and highly valued expertise" the plaintiff did not have)).

Gaines asserts Castle and Wilcox are proper comparators because, he alleges, they were all "Lead Men," "Crew Leaders," "Head Persons," "Foremen," or "Supervisors." (Doc. 21 at 5-7; doc. 61-4 at 44 (176); doc. 63 at 9). Defendants contend, and Gaines has not disputed, that Castle and Wilcox were "Construction Superintendents." (Doc. 61-1 at ¶ 25). Defendants also contend Gaines was a Laborer, (doc. 61-1 at ¶ 26; doc. 61-2 at ¶ 3; 61-2 at 6), which he disputes, stating he was "recognized as a 'Lead Person'" in 2003, and recognized as a 'Forman' [sic] in 2005," (doc. 63 at 10). However, the evidence Gaines submits to support his contentions does not support his claim.

The first document is a review form from 2003, indicating Gaines's ultimate career expectation, and JPS's expectation for Gaines, was that he be a "Lead Person." (Doc. 63 at 37). This directly contradicts Gaines's assertion he was already a Lead Man. Next to a note at the bottom of the exhibit stating "(+$1.00)," Gaines added a comment, asserting JPS had "acknowledge[d] [the]

job title with a raise." (*Id.*).[14]  This appears to be Gaines's inference stated as a fact, but it is not a reasonable one based on the original document.

The second document Gaines submits is an employment verification request completed by a third party stating his job title as "Foreman." (Doc. 63 at 38).[15]  However, there is no evidence (1) indicating Gaines's comparators were "Foremen," in addition to or opposed to "Construction Superintendents," as Defendants state, or (2) supporting a conclusion a "Foreman" has the same responsibilities as a "Construction Superintendent."  To demonstrate a plaintiff and his alleged comparators were similarly situated requires proof "that they were similarly situated in all relevant aspects, not just that they had the same job title and responsibilities." *Ashmore v. Sec'y, Dep't of Transp.*, 503 F. App'x 683, 687 (11th Cir. 2013).

Gaines describes his job duties as "whatever it took to do a job in a field of construction," "anything from busting up some concrete to maybe assembling some product." (Doc. 61-4 at 33 (130)).  He testified that, on a typical job, Johnson "assign[ed] the tasks to [Gaines] before [Gaines] went to the job site] and [told him], 'Okay, here's who's going and here's what you're doing." (*Id.* at 34 (133)).  Gaines "would probably have all the details and instructions as far as the construction of the swimming pool," and would both work at manual labor and making sure other workers were "following . . . according to whatever the process was as laid out by [Johnson]." (*Id.* at 34 (134-35)).  Gaines has not disputed Johnson's testimony that Construction Superintendents are responsible for the management of a job from planning to completion, specifically, reviewing the pool construction

---

[14] The comment was not part of the original document produced to Gaines. (Doc. 66-1 at ¶ 6; doc. 66-1 at 4).

[15] Defendants assert the document was filled out by a third party, who listed Gaines's title as "Foreman" and Gaines was never recognized as such because the title does not exist at JPS. (Doc. 66-2 at ¶ 6).  Defendants claim the title went unchanged on the form to avoid compromising the approval Gaines was seeking. (*Id.*).  This creates a question of fact on the question of Gaines's job title.

plan, preparing the layout of measurements, interfacing with the customer, instructing the Laborers, ensuring safety procedures are in place and used, and communicating with JPS management about the job. (Doc. 61-1 at ¶ 6). The only overlapping duty between Gaines's stated tasks and those of a Construction Superintendent is "instructing the Laborers."

Moreover, Gaines does not dispute both Castle and Wilcox had been working for JPS as Construction Superintendents for two years and one year, respectively, when Gaines was re-hired in March 2002. (Doc. 61-1 at ¶ 25). It is further undisputed Castle had taken it upon himself to acquire additional technical knowledge no one else at JPS had, (*id.* at ¶ 24), and Wilcox had returned to JPS after working as a building superintendent with another company and had around seventeen consecutive years in construction work when Gaines was hired in 2002, (*id.* at ¶ 23). Between 1981 and 2002, Gaines worked for JPS roughly six or seven years, on and off again, and for another home construction company for a year, (doc. 61-4 at 21-31 (81-123)), during which he also spent four years in jail, (doc. 61-4 at 31 (121)).

Even if the Court assumes Gaines was a "Foreman" as of 2005, there is no evidence to support his contention he was similarly situated to his alleged comparators. As a result, Gaines has not made out a *prima facie* case of discrimination in pay under § 1981, and Defendants are entitled to judgment as a matter of law on this claim.

**B. Discrimination in Training Opportunities**

To establish a *prima facie* case of discriminatory denial of training, "a plaintiff must show (1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination." *Newman v. Career Consultants, Inc.*, 470 F. Supp. 2d 1333, 1346-47 (M.D. Ala. 2007) (quoting *Thompson v. Potomac*

*Elec. Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)).  He must also establish the denial of training caused him to "suffer[] an adverse employment action." *Mack v. ST Mobile Aerospace Eng'g, Inc.*, 195 F. App'x 829, 845 (11th Cir. 2006).  "An adverse employment action must involve an ultimate employment decision or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him of employment opportunities, or adversely affects his status as an employee." *Id.* at 845-46 (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)) (internal quotation marks omitted).

Gaines asserts he was "denied the equal opportunity to participate in job training opportunities that were offered to [his] Caucasian co-workers." (Doc. 63 at 8).  He points to Defendants' response to his interrogatory #18, (*id.*), where it states:  "Castle attended training in Nashville, Tennessee in 2001 on swimming pool construction[16] and attended training in 2003 in Birmingham, Alabama on computerized pool systems," (doc. 55-3 at 6-7).  Gaines also asserts Wilcox "participated in the same said job training opportunities." (Doc. 63 at 8).

The only evidence other than Defendants' answer to Gaines's interrogatory is Gaines's own testimony Castle and Wilcox attended plumbing and electrical training. (Doc. 61-4 at 50 (199), 51 (201-02)).[17]  He does not know exactly when or where but claims it was sometime between 2006 and 2009. (*Id.* at 51 (201)).  He also testified, when he asked Johnson about going to the same program, Johnson told him "he got a possibility that [Gaines] would be in the program," but Gaines could not

---

[16] This training session occurred before JPS re-hired Gaines and is, therefore, irrelevant beyond establishing some limited training opportunities were provided.

[17] Gaines also testified that he assumes, based on their having learned new skills, that Castle and Wilcox attended spa and job-related equipment training somewhere at some time, (doc. 61-4 at 70-71 (280-83)); however, this is mere speculation based on the fact Castle and Wilcox learned new skills and he believes they must have had training "[b]ecause they learned it somewhere," (*id.* at 70 (280)).  There is no reliable evidence to support this speculation.

go to that particular training session because it had already been set up for Castle and Wilcox. (*Id.* at 50-51 (200-201)).

It is undisputed Gaines is a member of a protected class, and it appears, with the evidence viewed in the light most favorable to him, Defendants provided at least some limited training to their employees and Gaines was eligible for at least one instance of training he was denied. However, as discussed above, Gaines and his comparators were not similarly situated so, even as Gaines alleges them, the facts do not give rise to an inference of discrimination. The facts, even taken in the light most favorable to Gaines, show two Construction Superintendents were given training that he, as a Laborer or Foreman, may have been eligible for but was not given. Regardless, even if the Court assumes the evidence indicates some racial discrimination, the law requires a showing the discrimination altered Gaines's compensation, terms, conditions, or privileges of employment; deprived him of employment opportunities; or adversely affected his status as an employee. In *Newman*, the court found the plaintiff had made her *prima facie* showing because she was not given certain job-relevant training while her white comparator not only attended the training but replaced the plaintiff when the plaintiff was terminated, leading to the inference the training was used as a tool in the plaintiff's discriminatory replacement. *See* 312 F.3d at 1347. Gaines has made no allegations regarding the training's effect on his employment. He does not allege it led to his termination/suspension. He does not allege it led to raises for Castle and Wilcox to which he was not entitled because he did not have that training. He does not allege he was passed over for promotion because he did not have the training. He merely asserts he did not get the training and two white employees did. (Doc. 63 at 8).

As a result, Gaines has failed to state a *prima facie* case of discrimination under § 1981 based on denial of training; therefore, Defendants are entitled to judgment as a matter of law on this claim.

C. **Discriminatory Employment Action**

To establish a *prima facie* case of discriminatory discipline, the plaintiff must show (1) he was a member of a protected class, (2) who was qualified for his position, but (3) was subject to an adverse employment action and (4) treated less favorably than a similarly situated employee outside of his protected class. *Burke-Fowler v. Orange Cnty., Fla*, 447 F.3d 1319, 1323 (11th Cir. 2006). "[T]o prove adverse employment action . . . , an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 608 (11th Cir. 2008) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238–39 (11th Cir. 2001)). The employee's subjective perception of the seriousness of the change is not controlling, but the issue is viewed objectively from the perspective of a reasonable person in the circumstances. *Id.*

Gaines asserts "he was treated harshly different from his Caucasian co-workers when it came to the Company's drug-testing policy in that Plaintiff was consistently, allegedly random drug-tested over five (5) times when Plaintiff did test positive he was terminated, while his Caucasian co-worker[s] were merely suspended for violating the same said company policy." (Doc. 63 at 9). He points to Castle and Wilcox as similarly situated white employees treated more favorably than he despite the same conduct. (Doc. 21 at 8-9).

First, the evidence Gaines presents does not support his implied allegation he was targeted for drug tests based on race or any reason other than the company's policy. Of the five drug tests, two were for state recertification, one was after an accident, and two were listed as "random." (*Id.* at 19-33). The first random one was the positive test on July 17, 2008, (*id.* at 32), and, although the second is marked as "random," it appears to be the negative test allowing him to return to work at JPS in September 2008, (*id.* at 33). Gaines does not present any evidence other employees were

treated differently regarding the drug tests.

Second, Gaines has failed to establish a *prima facie* case based on Castle and Wilcox as comparators. Castle is not a proper comparator for Gaines. As noted above, a comparator must be similarly situated "in all relevant respects" and "nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d at 1091. As Johnson stated in his affidavit, and Gaines does not dispute, Castle had no other positive drug tests before or after the one to which Gaines points, (doc. 61-2 at ¶ 11), and had skills and knowledge no one else at JPS had, (doc. 61-1 at ¶¶ 24, 30). Gaines, on the other hand, was merely experienced at pool construction (knowledge others at JPS had), (doc. 61-4 at 49 (196)); doc. 55-3 at 7), and also had a known history of drug issues, for which he had previously been fired from JPS and spent four years in jail, (doc. 61-4 at 29-31 (113-14, 116-118, 121)).

Regarding Wilcox, Gaines asserts Wilcox would have had a positive drug test but was never tested after his on-the-job accident. (Doc. 61-4 at 60-61 (238-44)). Gaines does not dispute the insurer was responsible for having Wilcox tested, and, although a failed test would have been grounds for not covering the accident, the insurer covered the claim. (Doc. 61-1 at ¶ 34; doc. 61-2 at ¶¶ 13). Nor does Gaines offer any admissible evidence to dispute Johnson and his wife's affidavit testimony that they did not know Wilcox had not been tested. (Doc. 61-1 at ¶ 34; doc. 61-2 at ¶¶ 13). Gaines has not presented evidence to support the contention Defendants intentionally treated him less favorably than Wilcox. *See Ferrill,* 168 F.3d at 472 ("[P]roof of discriminatory intent is essential [under § 1981].").

As a result, Gaines has failed to state a *prima facie* case of discrimination under § 1981 based on unequal discipline; therefore, Defendants are entitled to judgment as a matter of law on this claim.

## IV. Conclusion

Based on the foregoing, Defendants' motion to strike Gaines's motion for summary judgment, (doc. 64), is **GRANTED** to the extent Gaines's motion seeks summary judgment, and the Clerk is **DIRECTED** to **TERM** Gaines's motion for summary judgment, (doc. 63); and Defendants' motion for summary judgment, (doc. 59), is **GRANTED** and this action **DISMISSED with PREJUDICE**. A separate Order will be entered.

DONE this 26th day of August 2014.

*[signature: James H. Hancock]*
SENIOR UNITED STATES DISTRICT JUDGE